IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

FILED

10:29 am, 3/16/12

Tim J. Ellis
Clerk of Court

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| ROGER WAYNE CHASE and | ) | Case No.  11-20311 |
| EDNA PEARL CARPENTER CHASE | ) | CHAPTER 11 |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| ROGER WAYNE CHASE and | ) | |
| EDNA PEARL CARPENTER CHASE | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adversary case No. 11-2015 |
| vs. | ) | |
| | ) | |
| SIOUX COUNTY RANCH LLC, | ) | |
| JOHN KOERSELMAN AS | ) | |
| MANAGER AND PERSONALLY, | ) | |
| MARTIN F. GRUNEICH JR., AS | ) | |
| MEMBER AND PERSONALLY, | ) | |
| CARROLL LEE "PETE" JENSEN, | ) | |
| PERSONALLY, AND | ) | |
| JENSEN INSURANCE, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION ON COMPLAINT

On March 7, 2012, this matter came before the court for trial on the Complaint to

Avoid a Fraudulent Conveyance Pursuant to 11 U.S.C. §548 and for Money Damages for

MisDealing by Conflicted Lenders and to Appoint a Receiver filed by Roger Chase and

Edna Carpenter Chase ("Chases").  Sioux County Ranch LLC ("SCR"), John

Koerselman ("Koerselman") as manager and personally, Martin F. Gruneich Jr.

("Gruneich") as member and personally (collectively known as the "SCR Defendants");

Carroll Lee "Pete" Jensen ("Jensen"), personally, and Jensen Insurance, Inc. (collectively

known as the "Jensen Defendants") are the remaining named defendants.  The parties

were represented as stated on the record.  At the conclusion of the trial, the court took the

matter under advisement.  The court having reviewed the record, testimony, evidence and

applicable law concludes judgment shall be entered for the Defendants and against the

Plaintiffs.

**Jurisdiction**

The court has jurisdiction over this adversary complaint pursuant to 28 U.S.C.

§§157(a) and 1334(a).  This is a core proceeding under §157(b)(2)(H).  The fraudulent

transfer allegation is brought under 11 U.S.C. §548.[1]  The equitable subordination

allegation is brought under §510.  The Racketeer Influenced and Corrupt Organizations

Act ("RICO") allegation is brought under 18 U.S.C. §1961 *et seq.*

**Facts**

The complaint raised five claims for relief against the SCR Defendants.  The

balance of the claims that remain for determination at trial include: (1) fraudulent

conveyance; (2) equitable subordination; and (3) a RICO claim.  The claims remaining

against the Jensen Defendants include: (1) equitable subordination; and, (2) a RICO

claim.

---

[1] Unless otherwise indicated, all future statutory reference are to the Bankruptcy Code, Title 11 of the United States Code.

The following facts were set out in the Final Pretrial order as established by

admissions in the pleadings or by stipulation of counsel.

1.      The Chases are and were at all time relevant to this proceeding husband and wife.

2.      The Chases were farming and ranching one parcel of land near Jay Em, Wyoming and two contiguous parcels in Sioux County, Nebraska.

3.      The Chases filed a voluntary Chapter 11 petition on March 29, 2011.

4.      The Chapter 11 petition was filed the morning of a hearing in one of two Forcible Entry and Detainer cases brought by SCR.

5.      The Chases financed their agricultural operations through New Frontier Bank.

6.      In about 2009, New Frontier was taken over and wound down by the Federal Deposit Insurance Corporation ("FDIC").

7.      At that time, the Chases had three notes with New Frontier, which were secured by the Chases' property and equipment.

8.      The Chases' three notes with New Frontier were purchased by an entity named US Acquisition, LLC ("US Acquisition") from the FDIC.

9.      The contract balance on the Chases' three loans was over $3,397,000.00, and with accrued interest, very close to $3,800,000.00.

10.     In the spring of 2009, the Chases approached an entity named SLS Partners. Previously, in March 2004, Mrs. Chase had sold some of her Nebraska property to SLS Partners, and then leased it back, with the option to re-purchase the same land within two years.

11.     In April 2006, by exercising her option, Mrs. Chase re-purchased the property and equipment for 24% over the sale price. In the spring or fall 2009, the Chases approached SLS Partners about another sale and leaseback, this time involving Roger Chase's Wyoming property at a sale price of $450,000,00, but the deal was never consummated.

12.   The Chases negotiated a transaction whereby an entity to be formed by
defendants Koerselman and Gruneich named Sioux County Ranch LLC
would buy property owned by the Chases and lease the property back to the
Chases.

13.   Koerselman and Gruneich formed SCR in early December 2009 and were
and continue to be its managing members.

14.   SCR does not own any properties other than the properties at issue in this
case.

15.   SCR is not a bank and it borrowed funds from Farm Credit Services to
finance its purchases.

16.   Starting at the end of 2009, in three separate transactions, the Chases sold
property to SCR for a total sum of $3,090,000.00, and then leased the
properties back with options to re-purchase.

17.   The options set a re-purchase price of ten percent over the purchase price
or the equivalent of one year's rent and could be exercised at any time
during the five-year term.

18.   The Chases made conveyances to SCR by way of Warranty Deeds.

19.   During all three transactions, the Chases were represented by their own
legal counsel, Darrell Huenergardt.

20.   On December 23, 2009, Mrs. Chase transferred by Warranty Deed, fee
simple title to 1,920 acres of her Nebraska property to SCR. SCR paid
$775,000.00 for the property. SCR concurrently entered into a lease in
which Mrs. Chase, as tenant, leased back the property requiring semi-
annual rent payments to SCR, the landlord, due each December 1 and June
1. Mrs. Chase also purchased an option to re-purchase the property for
$830,500.00 at any point during the next five years. The purchase price
and re-purchase price were based on an appraisal of the market value of the
land and irrigation equipment of $1,094,200.00 done by Farm Credit
Services.

21.   Mrs. Chase made distribution using sale proceeds as reflected on Trial
Exhibits 14-16. One distribution was to "Sioux County Ranch, LLC First
½ Rent per Lease Agree" in the amount of $37,750.00.

22. In conjunction with the sale, Farm Credit Leasing Services received a payment of $151,000.00 on the balance due of $219,820.81. Farm Credit Leasing Services forgave the balance owed, or about $68,000.00.

23. In January 2010, the parties signed Real Estate Purchase Agreements for two additional sale and lease-back transactions, one for 5,880 acres of Mrs. Chase's Nebraska property and another for 2,278 acres of Mr. Chase's Wyoming Property.

24. As a result of the appraisals by Farm Credit Services, the parties executed Addendums in which the purchase price purchase and corresponding re-purchase price were adjusted downward.

25. On February 5, 2010, Mrs. Chase transferred by Warranty Deed title to 5,880 acres of her Nebraska property to SCR. SCR paid $1,835,000.00 for the property. SCR also entered into a lease in which Mrs. Chase, as tenant, leased back the property requiring semi-annual rent payments to SCR, the landlord, due each March 15 and November 1. Mrs. Chase purchased an option to re-purchase the property for $2,018,500.00 at any time during the next five years.

26. The purchase price and re-purchase price were based on an appraisal of the market value of the land and irrigation equipment of $2,343,000.00 done by Farm Credit Services.

27. Mrs. Chase made distribution using sale proceeds as reflected on Trial Exhibit 15.

28. Mrs. Chase paid US Acquisition the amount of $1,613,267.00 from closing proceeds. US Acquisition and the Chases had reached a settlement agreement whereby the Chases would make that cash payment and also sign a $550,000.00 unsecured note to US Acquisition. In turn, US Acquisition would then release its security interest in both the Nebraska and Wyoming properties and equipment. As part of the settlement agreement, US Acquisition forgave outstanding principal debt of $1,233,733.00, and an additional $400,000.00 in accrued interest.

29. US Acquisition had been threatening to foreclose on the Nebraska and Wyoming real properties.

30.   Also on February 5, 2010, Mr. Chase transferred by Warranty Deed title to 2,278 acres of his Wyoming real property to SCR. SCR paid $500,000.00 for the property. SCR also entered into a lease in which Mr. Chase, as the tenant, leased back the property requiring semi-annual payments to SCR, the landlord, due each March 15 and November 1.

31.   Mr. Chase purchased an option to re-purchase the property for $550,000.00 at any time during the next five years. The purchase price and re-purchase price were based on an appraisal of the market value of the land and irrigation equipment of $850,000.00 by Farm Credit Services.

32.   Mr. Chase made distributions using sale proceeds as reflected on Trial Exhibit 16.

33.   A summary of the terms of the three transactions is contained in Trial Exhibit 20.

34.   The Chases made a rent payment to SCR in the spring of 2010. On July 2, 2010, the Chases and SCR agreed to an amendment that changed the due dates of rental payments under all of the three leases to December 1, 2010, and then each March 15 and December 1.

35.   The parties also agreed that the Chases would lease back the irrigation equipment for $15,000.00 a year, payable in semi-annual installments due at the same time as the rent payments, and also to reimburse on December 1, 2010 all of the property insurance and legal fees SCR had incurred.

36.   The Chases did not make the total payment of $173,027.85 when due on December 1, 2010.

After reviewing the testimony and evidence, the court finds the following additional facts and a more thorough description of the transactions between the Chases and SCR. The court finds that the Chases are educated, experienced, business people. Mr. Chase is a veterinarian and Mrs. Chase has farmed and ranched on her family's properties for what appears to be most of her life. Mrs. Chased owned the parcels in Nebraska. Mr. Chase owned the parcel in Wyoming. According to Mr. Chase, Mrs.

Chase was the expert in farming regarding the soil and growing conditions, planting, etc.
Both debtors appear to be knowledgeable about farming, ranching, banking, and
contracts.

Mrs. Chase had previous experience with sell-lease and buy back contracts as she
had entered into similar agreements with SLS Partners in 2004.  Mr. Chase was aware of
the transactions but not the specific details.

As stated above, the Chases financed their agricultural operations through New
Frontier Bank.  The bank failed causing the FDIC to take over.  Ultimately, the FDIC
sold the Chases' notes to US Acquisition.  The amount of debt, including interest was
nearly $3,800,000.00.

Platte Valley Bank also had a mortgage on the Wyoming property.  The Chases
were in default on that loan.  Platte Valley Bank was in the process of foreclosing, but
halted the procedure upon Mr. Chase entering into the agreement with SCR to sell the
property.

According to Mr. Chase, the Chases contacted a half-dozen banks attempting to
obtain financing after the failure of New Frontier Bank.  The Chases also approached
SLS Partners, but the parties never reached a deal.  Thereafter, the Chases were referred
to Gruneich, who is a distressed agricultural consultant.  At that time, Gruneich was
having health issues and declined to take the Chases as a client, but referred them to
Jensen.  The Chases contacted Jensen in July 2009.

Jensen is also a distressed agricultural consultant.  He testified that after
graduating from college, he worked for Farmer's Home Administration; was appointed

to the farmer's distressed loan committee; worked for a bank handling distressed and agricultural loans, and eventually went into the crop insurance business, along with his consulting. He met Gruneich in 1981, working with distressed farmers.

After the Chases contacted him, Jensen agreed to meet with them. Jensen came to Nebraska/Wyoming and was retained by the Chases as a consultant at the rate of $80.00 per hour. After Jensen reviewed the Chases' financial statements, tax information and operations, he provided advice and proposals to increase management efficiency and cash flow. Mr. Chase testified that Jensen approached another "half-dozen" banks on Chases' behalf in attempts to acquire funding for their operations. Other suggestions that Jensen proposed to the Chases included: planning the operating capital based on the Chases running 800 head of cow/calf pairs; reducing their horse herd; renting out their pasture land by pasturing other peoples' cattle; possibly selling a portion of the acreage and use the funds to operate the balance of their properties; encouraged the Chases to file an insurance claim for hail damage on their wheat crop; introduced the Chases to Producers Livestock Marketing Association ("Producers Livestock") and Cofina. The Chases ultimately entered into agreements with Producers Livestock and Cofina for loans to purchase cattle, seed and farming costs. Mr. Jensen introduced the Chases to Koerselman. The Chases first approached Mr. Koerselman as a lender. However, he declined and the parties eventually entered into the transactions described below.

Mr. Jensen was initially paid a retainer in the amount of $800.00. Mr. Jensen testified that he subsequently received a check for his services in an amount between $2,000.00- $3,000.00 from the Chases and later was paid from the proceeds of the

Page 8

closing of the first Nebraska transaction. The court's review of the settlement sheet for the closing reflects that he was paid the amount of $4,000.00. Mr. Jensen testified that he knew that the Chases did not have extra funds to pay him, and after helping find a buyer (SCR), assumed that he would be paid a finder's fee upon the closing of the transaction. This is a customary practice in the industry. He testified that he disclosed this information to the Chases, as he did not want to "double dip." After that time, he did not bill Chases for his services.

Mr. Chase testified that Pete [Jensen] "worked hard." Jensen was in constant contact with the Chases by telephone and fax and according to Mr. Chase, Jensen "and his wife came out every week trying to get this to work." He gave Jensen credit for the reduction of debt with Farm Credit and US Acquisition. Mr. Jensen had negotiated debt forgiveness in the amount of $68,000.000 from Farm Credit on behalf of the Chases. He also negotiated debt forgiveness with US Acquisition in the amount of $1,233.733.00 on the principal debt with an additional $400,000.00 in accrued interest. In Mr. Chase's words, Jensen "did a good job."

Mr. Chase testified that Jensen had other ideas and options for the management and cash flow issues, but "just because Pete mentioned it, does not mean it was a good idea." The Chases disagreed with many of the proposed modifications suggested by Jensen and did not incorporate them into their operations.

Thereafter, Koerselman and Gruneich through SCR and the Chases entered into the transactions detailed below:

Page 9

Nebraska One.  On November 27, 2009, the Chases [2] executed the Real Estate

Purchase Agreement ("Purchase Agreement") for the sale of 1,920 acres and certain

equipment in Nebraska owned by Mrs. Chase.[3]  As the parties have stipulated, the sale

price was $775,000.00.  Simultaneously, the Lease Agreement was executed, whereas

Mrs. Chase leased the property at an annual rent amount of $75,000.00 for a period of

five years.  By the terms of the Purchase Agreement, the first one-half of the annual rent

for the first year was paid from the proceeds of the sale.  One half of each annual rent

payment was due on June 1 and December 1, thereafter.  Additionally, the parties entered

into a Real Estate Option Agreement. The option price was $15,100.00, providing the

Chases the right to repurchase the 1,920 acres and equipment for a set repurchase price in

the amount of $830,500.00.  The option could be exercised within the next five years.

One of the conditions of the option agreement was that the Chases could not exercise the

option if they were in default on rent payments.

The proceeds from the sale were distributed, in part, to Platte County Bank for the

pay off of the first mortgage ($468,036.61); payment of the option price to SCR

($15,100.00); Jensen ($4,000.00); Paul Reed Construction mechanics lien ($4,500.00);

Howe Seeds judgment ($27,116.74); Farm Credit Leasing Services payoff

($151,000.00); Herren Bros payoff ($10,580.39); attorney fees for seller and buyer

---

[2] Both of the Chases signed all agreements and documents pertaining to all the sales, due to homestead laws of Nebraska and Wyoming.

[3] Koerselman subsequently assigned the Purchase Agreement, Option and Lease to SCR, upon its formation.

($12,693.00);[4] and the first half of the annual rent ($37,750.00). The settlement statement reflects that the Chases received $4,852.04. According to the stipulated facts and the testimony, Farm Credit Leasing Services forgave debt in the amount of nearly $68,000.00 in connection with this transaction.

Thereafter, there was a delay in the closings on the other two properties. SCR was obtaining loans from Farm Credit Services to purchase the properties. Mr. Koerselman testified that the appraisals being conducted on behalf of Farm Credit Services took additional time. Additionally, both SCR and Farm Credit Services required the titles to the real property and equipment to be free and clear of other encumbrances. The title searches reflected debts from the Chases that had not been disclosed to SCR and adverse encumbrances on the Nebraska and Wyoming real property. These issues had to be resolved before the closings could occur.

Nebraska two. The purchase agreement was executed by the Chases on January 2, 2010 and by SCR, through its manager, Koerselman, on January 5, 2010. The sale consisted of 5,880 acres in Nebraska for the amount of $1,900,000.00. Thereafter, the appraisal were completed reflecting that the value of the property was less than originally determined. The land and equipment were appraised in the amount of $2,343,000.00. The parties executed an addendum adjusting the sale price downward to $1,835,000.00. Additionally, the option price was reduced to $36,700.00. Again, simultaneously, the

---

[4] The parties agreed in the purchase agreements that the sellers were responsible for the buyers' attorney's fees and costs.

parties entered into a lease agreement requiring an annual rent payment in the amount of

$183,500.00 that required semi-annual rent payments on March 15 and November 1 in

the amount of $91,750.00 each. The terms of the option allowed the Chases to exercise

their ability to re-purchase the property for a period of five years at the constant re-

purchase price of $2,018,500.00.

The sale proceeds were distributed in part, at follows: US Acquisition

($1,613,267.00); Sioux County Treasurer for 2008 and 2009 taxes ($36,489.02); option

purchase price ($36,700.00). The Chases received $762.18 from the sale proceeds.[5]

Again according to the stipulated facts and testimony, US Acquisition forgave the

outstanding principal debt in the amount of $1,233,733.00 and an additional $400,000.00

in accrued interest. The Chases signed an unsecured note to US Acquisition in the

amount of $550,000.00.

The terms of the Real Estate Options Agreement relating to this transaction

include the following language, "Buyer shall also have no right to exercise the Option

unless Buyer and Roger Chase simultaneously exercise all other options that Buyer and

Roger Chase have on properties owned by Seller and such transactions are closed

simultaneously." Mr. Koerselman testified that after the appraisal came back with the

values much lower than originally discussed, his lender, Farm Credit Services and SCR

determined that this language was necessary upon the net equity calculations as some of

the properties had more value than others overall.

---

[5] The settlement sheet indicates there were additional distributions in the amount of $139,236.75 for pay offs on equipment and irrigation debt.

Wyoming property. The Real Estate Purchase Agreement was executed by the
Chases on January 2, 2010 and by SCR, through its manager, Koerselman, on January 5,
2010 providing for the sale of 2,278 acres in Wyoming by Mr. Chase to SCR for the
amount of $700,000.00. The testimony provided was that this value was provided by the
Chases prior to the completion of the Farm Credit Services' appraisal. After receipt of
the Farm Credit Services appraisal, the sale price for the land and equipment and option
price were adjusted downward to $500,000.00 and $10,000.00, respectively. The option
provided Mr. Chase the opportunity to re-purchase the real property and equipment, if
not in default on his rent, at the fixed price of $550,000.00 for a period of five (5) years.
Mr. Chase also simultaneously entered into a lease agreement to pay annual cash rent in
the amount of $50,000.00 in bi-annual payments of $25,000.00 on March 15, 2010 and
November 1, 2010, and on that same date in subsequent years.

The terms of the Real Estate Option Agreement also included the following
language, "Buyer shall also have no right to exercise the Option unless Buyer and Edna
Carpenter Chase simultaneously exercise all other options that Buyer and Edna Carpenter
Chase have on properties owned by Seller and such transactions are closed
simultaneously."

The sale proceeds were distributed, in part, as follows: Goshen County Treasurer
for taxes from 2006 through 2009 ($46,255.71); Platte County Bank payoff of first
mortgage ($412,033.88); First National Equipment Financing Service payoff
($52,2657.54); option price ($10,000.00); and attorneys' fees for the seller and buyer
($3,988.75). The Chases received the amount of $4,970.38.

Mr. Chase testified that the downward adjustments of the sale prices on the second Nebraska and Wyoming transactions reduced the amount that the Chases were to receive. These were the funds that the Chases were relying upon to fund their operating costs.

After the closings on all three sales, on Tuesday, March 2, 2010, Koerselman sent the Chases an e-mail to clarify rental payment dates. SCR agreed to modify the due dates so that all of the first-half rents would be modified to be due on March 15 and all of the second-half rents would be due on December 1 beginning on December 1, 2010. On March 15, 2010, the Chases requested and SCR agreed to extend the date that rent was due on the second Nebraska and Wyoming lease payments from March 15, 2010 until April 1, 2010 as a "one time" event. SCR also provided "Reimbursement of the insurance costs will be satisfactory when paid with the rent or sooner."

Additionally, shortly after the closing on the Wyoming property, the Chases proposed to exercise the option to repurchase that property alone and without regard to the cross-collateralization provisions of the Option Agreement. SCR offered to allow the Chases to purchase the Wyoming property for the amount of $595,000.00. Mr. Koerselman testified that the reason that this amount was greater than the established re-purchase price is that the Chases only wanted to exercise their option on the Wyoming property and modify the executed option agreements. The Chases did not accept the offer. At that time, SCR had not yet received any rent payments on the Wyoming or second Nebraska transaction properties.

Additionally the Chases were suppose to pay insurance and failed to do so. As SCR felt it was imprudent to go uninsured, it paid the premiums in the amount of $5,114.00 in the Spring of 2010.

On May 4, 2010, the parties entered into an irrigation agreement whereas SCR purchased up to $100,000.00 of irrigation and related equipment to be placed on the real property. The Chases agreed to pay $15,000.000 annually to rent the equipment, with the first payment due on December 1, 2010 in the amount of $15,000.00; and subsequent annual payments to be paid in bi-annual payments in the amount of $7,500.00 each, on March 15 and December 1.

In October 2010, the parties entered into an Agreement regarding an oil and gas bonus and royalty payment. Although the oil and gas rights belonged to SCR, Koerselman testified that the Chases and SCR split the payment fifty-fifty (50/50). He testified that he felt this was fair as Mrs. Chase had negotiated for the payment. The Chases received one-half of the payments to use at their discretion. SCR agreed to make its one-half available to the Chases to purchase irrigation equipment and other depreciable assets, at their discretion. The testimony was that the parties received a total amount of approximately $116,000.00. Mr. Koerselman testified that SCR invested $132,000.00 into the cost of the pivot. It is not currently operational. The Chases filed bankruptcy before the work could be completed on the pivot.

As of December 1, 2010, the Chases owed total rent payments in the amount of $154,500.00; reimbursement of insurance premiums paid by SCR in May, 2010 in the

amount of $5,114.00; irrigation equipment lease payment in the amount of $15,000.00

and delayed attorney fees payment in the amount of $5,913.85.[6] Portions of the

correspondence between the parties following December 1, 2010 include the following:

| | |
|---|---|
| December 6, 2010 | E-mail from Koerselman to Chases regarding the payment plan for December 1 rent. Koerselman giving the Chases a "heads up" that Gruneich will be in Korselman's office the following day and SCR did not have a written plan or rent payment on the past due December 1 amount. |
| December 7, 2010 | Mrs. Chase replied that the Chases were "combining the corn, look at corn sales, see what the crop insurance settlement(s) are on the corn, look at the dry bean inventory and dry bean sales and at the cattle sales. The crop sales and crop insurance proceeds have Cofina and Westco on the checks. The cattle proceeds come through PLMA[7]. Cofina, Westco, PLMA and you and Rick all have to be content as we accomplish this turn." |
| December 7, 2010 | Mr. Koerselman stated "We are being advised to present you with a notice of default. This is following the letter of the lease agreement...We have decided not to do that at this time. SCR again requests a "detailed itemization of how you will commit to pay the Dec. 1 past due rent...How many dollars you think you will pay us by a specific date. Also, when the final amount of the Dec. 1 rent will be paid." |
| December 31, 2010 | The Chases presented a handwritten proposal to pay SCR:<br>$13,000.00    "now"<br>By Jan. 30    $14,000.00<br>Feb. 15    $91,500.00<br>Mar. 10    $50,000.00<br>April    $154,000.00<br>The note reflects that "all these payments are subject to approval and release of funds by Cofina and PLMA. |

---

[6] The court does not include interest, the default rent rate, of post December 1, 2010 adjustments in this figure.

[7] This is the Chases reference to Producers Livestock.

The testimony reflects that the Chases did pay SCR the amount of $13,000.00.

| | |
|---|---|
| January 6, 2011 | Through its attorney, SCR sent a "Notice of Default" to Mrs. Chase regarding the two Nebraska properties and Mr. Chase regarding his Wyoming property. |
| January 13, 2011 | Mr. Koerselman sent an e-mail to Mrs. Chase regarding an easement and "The Notice," stating, "We don't have the luxury of not being covered by the rent cash flow. We put ourselves into jeopardy by not executing the notice and it affects our credibility. I am confident that you will be making the payments and hence we will be favorably interested in restoring option privileges." |
| January 20, 2011 | The Chases sent (by fax) a hand written letter describing the sale of cattle, Cofina crop loan information and the disclosure that the Chases are requesting additional operating loans from Lusk State Bank; anticipated sales from wheat, and their plans for the 2011 cow program. |
| February 10, 2011 | The Three-Day Notice to Quit was posted at the residence of Mrs. Chase. |
| February 11, 2011 | The Three-Day Notice was served on Mr. Chase for the Wyoming property. |
| February 11, 2011 | The Chases notified Koerselman regarding the sale of cows and stated that the proceeds would be received from Producers Livestock and sent to SCR "as soon as possible." |
| February 11, 2011 | Koerselman replied to Mrs. Chase, asking for her "best estimate of how many dollars" SCR would receive and when. |
| February 12, 2011 | Mr. Koerselman forwarded Mrs. Chases' February 11, 2011 message to Gruneich. |
| February 28, 2011 | Mrs. Chase sent an e-mail to Koerselman describing the crop input loan, loan renewal at Producers Livestock; status of the operating loan application to Lusk State Bank and the payment on the bean contract. |

| | |
|---|---|
| March 11, 2011. | Mr. Koerselman provided an e-mail to the Chases stating, "These are odd and difficult times, yet again. I know there is a court date coming which we are supposed to do. I am hopeful that when all this 'legal stuff' is through we will make a deal for you to pay first half rent promptly and we'll accept payment on the Dec. 1 rent as you shake that money loose as you've previously described. I can't make any commitments now but that is what I am thinking. Terms on everything won't be exactly the same, but, hopefully, we'll have the opportunity to end up as we all originally hoped." |
| March 15, 2011 | A Complaint for Forcible Entry and Detainer and Summons was served on Mr. Chase regarding the Wyoming property. The hearing was scheduled for March 29, 2011 in the Circuit Court of the Eighth Judicial District. |
| March 19, 2011 | Mr. Koerselman sent an e-mail with an attached letter proposing the sale of the Wyoming property to the Chases for $620,000.00 and describing the details of the offer and payment of all past due rents. |
| March 21, 2011 | Mrs. Chase responded to Koerselman's March 19, 2011 proposal, taking it under review. |
| March 21, 2011 | The Service Return reflects that the Summons and Complaint for Forcible Entry and Detainer were served on Mrs. Chase. |
| March 23, 2011 | The Chases sent Koerselman a handwritten proposal outlining their efforts in "resolving the situation at hand." The Chases proposed<br>1.   That the rent and past due amounts would be brought current from the bean sale proceeds, cattle sales and proceeds from a loan from Lusk State Bank.<br>2.   That Chases propose pay the option contract price of $550,00 for the Wyoming property with a real estate loan from the Lusk State Bank.<br>3.   That the Chases get a loan to purchase the "Henry Property" from SCR for the contract purchase price of $2,750,000.00. The final details of the sale would be negotiated.[8] |

---

[8] This roughly appears to be the price that SCR paid the Chases for both Nebraska real properties and equipment.

> 4.    SCR would loan the Chases funds to pay Republic
>        Financial a lump sum cash settlement.

The letter included the statement, "If this is not something you can consider, it appears that the only alternative could be bankruptcy protection."

The Chases filed their Chapter 11 Bankruptcy on March 29, 2011. Mr. Koerselman testified that at the time that the Chases filed their bankruptcy, the additional total rent payments in the amount of $154,500.00 for all three properties due and owing on March 15 was unpaid.

## Discussion

Fraudulent transfer law allows the avoidance of transactions which unfairly or improperly deplete a debtor's assets.[9] Under §548(a)(1)(B) an unfair or improper transaction is one in which the unfairness stems from a disparity of exchange coupled with the debtor's lack of other assets. The trustee, or in the case before the court, the debtor-in-possession, the Chases, may avoid any transfer of a debtor's interest in property if they establish the following elements:

(1)    the debtor had an interest in the property;

(2)    that a transfer of that interest occurred within two years of the filing of the bankruptcy petition;

(3)    that the debtor was insolvent at the time of the transfer or because insolvent as a result of the transfer; and

---

[9] 5-548 *Collier on Bankruptcy* P 548.01, Matthew Bender & Company, Inc. (2012).

(4)     that the debtor received "less than reasonably equivalent value" in exchange for such transfer.[10]

The Chases must prove that the elements have been met.

"Reasonably equivalent value" is not defined by the Bankruptcy Code. Value is defined as property, or satisfaction or securing of a present or antecedent debt.[11] Determination of reasonably equivalent value is a question of fact and based on the facts and circumstance rather than a fixed mathematical formula. Value has been defined as that which provides an economic benefit, either direct or indirect to the debtor. The reduction in the debtor debt constitutes value.[12] This court also finds that the options to re-purchase had value.

In determining solvency, the appropriate valuation date is the date of the subject transfer. A transfer must be valued at the time it is made, i.e. the date for defining reasonable equivalence is the date of the transfer. Subsequent appreciation or depreciation is not considered for the purpose of determining reasonably equivalent value into a fraudulent transfer.

The first two elements are undisputed. The Chases had an interest in the real property and equipment that was transferred. The transactions between SCR and the Chases occurred in December 2009 and February, 2010. The Chases filed their

---

[10] §548(a)(1)(B).

[11] §548(d)(2)(A).

[12] *Wilkinson v. John Wiley & Sons, Inc.*, 319 B.R. 134 (Bankr. E.D. Kent., 2004).

bankruptcy petition on March 29, 2011.  The transactions occurred within two years
before the date that the Chases filed their bankruptcy petition.

Based upon the testimony and evidence, the Court finds that the Chases were
insolvent on the dates the transactions occurred.  There was testimony that Mrs. Chase
reserved from all the above transactions, the original family homestead and twenty acres.
However, there was not any testimony regarding its value or other assets that the Chases
own.  In spite of the Chases' assurances to SCR that they could "make this work," it
appears to the court that the Chases operated on the financial edge, borrowing each year
for operating funds, improvements, funds to buy cattle and seed, using their real property
as security.  This was a course of financial conduct for them.  The Chases appeared to
consistently and historically borrow money "from Peter to pay Paul."  Mr. Koerselman
acknowledged in his testimony that the deal with the Chases was risky, but based upon
their assurances to him of their unique abilities, i.e, Mr. Chase's ability to earn extra
income from veterinary services and to purchase less-than-desirable cows and make them
profitable, he agreed to the "go-ahead" with the transactions.  The testimony also
reflected that the Chases incurred a combined net loss on their taxes each year.  The
Chases were insolvent at the time of the transfers.

In determining whether the Chases received less than "reasonably equivalent
value" for the purchase of the real property and equipment, court finds:

a.  <u>Cash funds</u>.  The actual purchase price of each of the three transactions was $755,000.00, $1,835,000.00, and $500,000.00, respectively

b.  <u>Debt forgiveness</u>.  The Chases benefitted by the debt forgiveness from Farm Credit Leasing Services in the amount of $68,000.00 and US Acquisition in the amounts of $1,233,733.00 and $400,000.00.

c.  <u>Option values</u>.  In determining the option value at the time that the transfers were made, the court subtracts the option's exercise price from the appraised price as presented by SCR.  The options' values were $263,700.00, $324,500.00 and $300,000.00, respectively.

d.  <u>Other economic value</u>.  The court's review of the settlement sheets from the three closings reflect that the Chases disbursed funds and extinguished over $2,956,000.00 in existing debt not related to the costs of the transactions that they entered into with SCR.  These claims included, in part,  satisfaction of past due taxes, a judgment entered against the Chases, a mechanics lien that had been filed, and mortgages.

e.  <u>Other non-economic value</u>.  The court finds that the continued ability to farm and ranch has value to the Chases.  Mr. Chase said it himself, "they wanted to farm."  Additionally, Mrs. Chase had the opportunity to reorganize financially, and re-purchase her family's homestead.

In summary, the Chases benefitted financially in the amount of $5,679,993.00.[13] The total market values attributed to the three properties and equipment by the Farm Credit Services, was $4,287,200.00. The court found the Farm Credit Services appraisers' testimony and the resulting appraisals to be credible. The Chases argued that the court should considered the appraisals conducted in the week before the hearing in determining reasonably equivalent value. This court disagrees as that is contrary to the law that the date to determine reasonable equivalence is the date the transfer was made. The transfers between the Chases and SCR were made in December 2009 and February 2010. The Farm Credit Services appraisals were completed at that time. Considering the facts and circumstances described above, the court finds that the Chases received more than reasonably equivalent value in exchange for the real property and equipment.

The Chases failed to carry their burden that the three transactions between themselves and SCR were fraudulent transfers. Therefore, the court finds for the Defendants, Sioux County Ranch, John Koerselman, and Martin F. Gruneich, Jr. regarding the allegations of fraudulent transfers.

## II.    Conspiracy as related to equitable subordination under §510

The Chases allege that due to the conspiratorial conduct between SCR, Koerselman, Gruneich, Jensen and Jensen Insurance, Inc., their claims should be subordinated under §510. The court is permitted to subordinate, on equitable grounds,

---

[13] The court calculated this amount by adding all the outstanding debt that was paid upon distribution of the sale proceeds, the option values and the debt forgiveness amounts.

all or any part of an allowed claim or interest to all or any part of another allowed claim

or interest. The court may order that any lien securing the claim subordinated be

transferred to the estate. The subordination must be based on the principles of equitable

subordination. These principles are defined by case law, and have generally indicated

that a claim may be subordinated only if its holder is guilty of misconduct.

The bankruptcy doctrine of equitable subordination looks not to the substance of

the transaction but to the behavior of the parties involved. There are three requirements

that must be met for a court to exercise its equitable subordination power: (1) inequitable

conduct on the part of the claimant sought to be subordinated; (2) injury to the other

creditors of the bankruptcy or unfair advantage of the claimant resulting from the

claimant's conduct; and (3) consistency with the provision of the Bankruptcy Code. The

critical inquiry is whether there has been inequitable conduct on the part of the party

whose debt is sought to be subordinated. Equitable subordination in bankruptcy is not

justified absent a finding that the party sought to be subordinated engaged in inequitable

conduct. Inequitable conduct for subordination purposes in bankruptcy encompasses

three categories of misconduct: (1) fraud, illegality, and breach of fiduciary duties; (2)

undercapitalization; or (3) a claimant's use of the debtor as a mere instrumentality or alter

ego. In order to make a prima facie showing of inequitable conduct in bankruptcy,

claimants must present material evidence of unfair conduct and demonstrate some

culpability.[14]

---

[14] *In re Hedged-Investments Associates, Inc.* 380 F.3d 1292 (10th Cir. 2004).

The Chases assert that SCR, Koerselman, Gruneich and Jensen conspired to "steal" their land, and committed RICO violations of larceny, mail fraud and wire fraud. Having committed this misconduct, the defendants' claims should be subordinated.

Jensen Insurance, Inc. The court's review of the record does not show that Jensen Insurance, Inc. filed a claim in this case. Additionally, the Chases did not provide any testimony regarding Jensen Insurance, Inc. Therefore, the court finds for Jensen Insurance Inc. regarding any claim for subordination under §510.

Jensen. The court finds that Jensen introduced the Chases to Koerselman, and what later became SCR with Gruneich as a member. He was employed by the Chases as a distressed agricultural consultant providing them advice in attempts to finding remedies and funding so they could continue to farm and ranch. After the transactions with SCR were completed, Jensen appears to have continued to have a working relationship and friendship with the Chases. He personally borrowed money, which he loaned to the Chases after other banks would not, for operating funds. After the Chases failed to meet their rental obligations and SCR instituted legal actions, Jensen continued to assure the Chases that SCR would attempt to work with them. The court's review of the testimony and evidence shows that Jensen did not perform any inequitable conduct. He continually worked to provide the Chases solutions. The court also finds it incongruent that on one hand, Mr. Chase testified that Jensen did a good job for the Chases, giving Jensen credit for the large amount of debt forgiveness that he accomplished for their benefit, testifying

on the number of times Jensen called each day and appeared in person at the Chases in his capacity as consultant. Mr. Jensen provided numerous plans and advice for the Chases to pursue. However, they chose to continue their historical farming and ranching operations. The court does not find that Jensen's actions were the basis of any misconduct. Additionally, Jensen has not filed a claim in this case. Therefore, the court finds for Jensen regarding the equitable subordination claim under §510.

    SCR, Koerselman, and Gruneich. The court's review of the conduct of SCR, Koerselman and Gruneich reflects that they entered into a risky business transaction with the Chases. There is no doubt that the Chases were grasping at straws to get financing after having been turned down by numerous banks. However, the terms of the options did not escalate the repurchase price during the five year period as the terms in the SLS Partners transaction had. SCR allowed numerous concessions including: allowing the first spring payment to be made late; modification of the rental due dates; SCR paid the insurance in the Spring of 2010; and allowed the Chases to delay paying costs and expense of the transaction. SCR allowed the Chases to retain and use, at their discretion, one-half of the oil and gas bonus and royalty funds in the amount of $58,000.00, while investing SCR's one-half into the property toward additional improvements. SCR invested $100,000.00 into the irrigation systems, which combined with the oil and gas funds totaled $158,000.00 available for the Chases to use on improvements.[15] During the

---

[15] The testimony was that SCR's investment toward the pivot was $132,000.00. The court was not made aware of the discrepancies between the amount SCR provided for improvements to the irrigation system and the

period of time that SCR was proceeding with its legal remedies under the agreements and

leases, there were continued discussions in attempts to get partial payment of delinquent

rents. The court does not find that SCR, Koerselman or Gruneich's conduct with the

Chases was inequitable. Therefore, the court finds for SCR, Koerselman and Gruneich

on the allegations under §510.

## III.   RICO Claim

The Chases allege that SCR, Koerselman, Gruneich, Jensen and Jensen Insurance

Inc. violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") based

upon e-mails and mail that crossed state lines as the defendants schemed to buy, lease

and provide an option to re-purchase the Chases' property. The Chases first alleged the

defendants' violation was based upon larceny. Subsequently, the Chases modified that

allegation to wire and/or mail fraud.

Under RICO,

> "it is unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct of
> such enterprise's affairs through a pattern of racketeering activity."

To establish a RICO claim, the plaintiff must prove: (1) a violation of the

RICO statue; (2) an injury to business or property; (3) that the injury was caused

by the violation of §1962. Members of the enterprise must share a common

purpose to engage in a particular fraudulent course of conduct and work together

---

balance actually used.

Page 27

to achieve their goal.  The claim must be supported by information regarding the

hierarchy, organization and activity of the alleged enterprise to support the

allegation that the enterprise is functioning unit.  A pattern of racketeering activity

requires a showing of at least two related predicate acts of activity occurring

within a ten year period.[16]  Predicate acts of racketeering activity include a variety

of federal and state criminal offenses...common law fraud under state law does not

constitute such an act.

A pattern is established by showing that the predicate acts relied upon are

related and that they amount to or pose a threat of continued criminal activity.

Plaintiff must show that the defendants' activities are neither isolated or sporadic.

The element of continuity may be satisfied by a showing of either open ended

continuity or close ended continuity.  Open ended continuity must show that there

was a threat of continuing criminal activity extending indefinitely into the future.

The threat must extend beyond the period during which the predicated acts were

performed.  The court considers the nature of the enterprise and the predicated

acts alleged.  Closed ended continuity is shown by proving a series of related

predicate acts extending over a substantial period of time.  A period of at least two

years of criminal activity is necessary to support an allegation of closed-ended

continuity.  The court must also consider the number and variety of predicate acts,

---

[16] 18 U.S.C. 1961(5).

the number of both participants and victims and the presence of separate schemes.
When a plaintiff alleges nothing more than a single scheme of narrow scope
including one victim and a limited number of participants, closed ended continuity
does not exist.

The court having reviewed the record finds that the Chases did not provide
any testimony regarding Jensen Insurance, Inc. in this case. Therefore, the court
finds for Jensen Insurance Inc. regarding any RICO claim under 18 U.S.C. 1961 *et
seq.*

This court has already found that Chases received reasonably equivalent
value in the transactions. Additionally, the court has found that there was not a
conspiracy between the defendants allowing for equitable subordination of their
claims under §510. Now the court finds that the correspondence between the SCR
by and through its manager, Koerselman, does not meet the elements of mail and
wire fraud. The court does not find there was an intent on the part of SCR,
Koerselman, Gruneich or Jensen to obtain property by fraud. The e-mails, faxes
and mail regarding the sale, lease and buy-back options were just that as between
the parties, correspondence regarding a business transaction.

The Chases have not met the burden in proving any RICO violation.
Therefore the court finds for SCR, Koerselman, Gruneich, and Jensen regarding
the RICO allegation.

In conclusion, the court finds for the defendants, Sioux County Ranch, LLC, John Koerselman as Manager and Personally, Martin F. Gruneich Jr. As Member and Personally, Carroll Lee "Pete" Jensen, Personally, Jensen Insurance, Inc. and against Plaintiffs, Roger Wayne Chase and Edna Pearl Carpenter Chase on all allegations of the complaint.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

DATED this 16th day of March, 2012

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
Ken McCartney
Tracy Oldemeyer
Margaret White